**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  97-399-1** |
| | : | |
| **RONALD HARRIS** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                           **December 31, 2020**

Judge Hutton found twenty-four-year-old Ronald Harris and an accomplice robbed two delivery drivers at gunpoint in July and August 1996. Mr. Harris used a gun and his accomplice went through the drivers' pockets for the money. They earned a lengthy sentence. Judge Ludwig sentenced Mr. Harris's accomplice to sixty-six months in prison.  Congress then required Judge Hutton to sentence Mr. Harris to a mandatory consecutive twenty-year sentence after a mandatory minimum five-year sentence because he used a gun first in the July 1996 robbery and then in the August 1996 robbery.  Judge Hutton sentenced Mr. Harris to 357 months in custody. Congress changed this sentencing policy a little over two years ago by eliminating the mandatory stacking of firearms sentences if the convicted defendant did not have an earlier gun conviction. Mr. Harris has served over twenty-three years in prison.  He rehabilitated through dozens of classes, regular and trusted work, and without an incident in over thirteen years.

Mr. Harris now moves for compassionate release citing his extensive rehabilitation, the presence of COVID-19 in his facility, and current federal sentencing policy set by Congress in December 2018.  The fear of the pandemic is not grounds for release particularly given his present care. But his extensive rehabilitation recognized by the Bureau of Prisons combined with being overweight to the brink of clinical obesity creating health risks and the fundamental disparity in his present sentence under our federal sentencing policy constitute extraordinary and

compelling reasons for us to consider compassionate release. We scrutinized Mr. Harris's serious crimes and his drug-addicted adolescence leading to the armed robberies. No one disputes he is a much different man today. Reducing his sentence to time served complies with Congress' sentencing policy. Mr. Harris does not present a risk to the community which cannot be addressed by conditions on his supervised release in a suitable residence. We order Mr. Harris released consistent with United States' sentencing policy.

## I. Background

Philadelphian Ronald Harris, the middle child of three siblings, reported his parents separated in his teenage years.[1] His father left their family home and did not support Mr. Harris and his siblings.[2] Shortly after his parents separated, Mr. Harris began experiencing substance abuse problems involving alcohol, marijuana, cocaine, valium, and PCP.[3] His drug habit contributed to his decision to withdraw from high school and begin "robbing people" to support the drug addiction.[4] Mr. Harris also has a history of depression in his family and began taking antidepressants at sixteen years old.[5]

### A. The two summer 1996 armed robberies leading to his present sentence.

Twenty-four-year-old Mr. Harris and an accomplice robbed two soda delivery truck drivers at gunpoint in July and August 1996.[6] Mr. Harris used a gun and his accomplice stole the money from the drivers' pockets. They stole a total of $1,550 from the drivers.[7] The grand jury indicted Mr. Harris for: conspiracy to commit robbery; two counts of robbery; and use of a firearm and aiding and abetting the use of a firearm during a crime of violence.[8] Mr. Harris pled guilty to all charges.[9]

Judge Hutton sentenced Mr. Harris to 357 months of incarceration and three years of supervised release.[10] Judge Ludwig sentenced his accomplice (who did not use a gun) to sixty-

six months.[11] Mr. Harris's 357-month sentence consisted of fifty-seven months on the conspiracy and robbery counts to run concurrently with each other, a mandatory minimum five-year sentence on the first firearm charge to be served consecutively, and a mandatory minimum twenty-year sentence on the second firearm charge to also be served consecutively.[12]  At the time of his sentencing, Mr. Harris had been earlier sentenced separately in state court for robbing grocery store employees at gunpoint on two separate occasions in late 1996.[13] The Commonwealth sentenced Mr. Harris to eight to sixteen years, to run concurrent for each of these robberies.[14] Judge Hutton allowed Mr. Harris's fifty-seven-month federal sentence to run concurrent with a state sentence but noted the 300-month firearm sentences then required by Congress would have to run consecutive to any state sentence.[15]  Since Judge Hutton imposed this sentence, Congress changed the law mandating Mr. Harris's firearm sentences be served consecutively to other sentences, or "stacked" on top of each other. This stacking requirement now applies only if the defendant had a previous, final conviction for a firearm offense, rather than in all cases with multiple firearm offenses brought in the same prosecution.[16] Since Mr. Harris did not have any such convictions at the time of the instant robberies, he would be sentenced to a 177-month sentence – fifteen-years less than his actual sentence – if sentenced today.

Mr. Harris is now almost forty-nine years old and has served over 258 months, or 72.27%, of his federal sentence. The Bureau of Prisons reports his anticipated release date is July 26, 2027. Mr. Harris is currently serving his sentence at Federal Correctional Institution Fort Dix.

**B.      Mr. Harris's conduct in prison.**

Mr. Harris made productive use of his over twenty-three years in prison. Mr. Harris began his sentence at a high-security facility and the Bureau of Prisons found him capable of transferring to FCI-Fort Dix, a low security prison.[17] The United States represents his last disciplinary infraction occurred thirteen years ago.[18] Mr. Harris obtained his GED and completed at least twenty-seven Bureau of Prisons educational programs at FCI-Fort Dix, including a 320-hour associate certificate in electronic technology completed in a little over one year, a forty-six-hour suicide companion workshop, a forty-hour parenting program, a twenty-four hour victim impact course, a thirteen-hour freedom from drug education program, and a ten-hour ethics course.[19] He has also completed various workshops in professionalism, time management, teamwork, interviewing, and job searching.[20] He is currently enrolled in courses on financial literacy and business mathematics.[21] Mr. Harris represents he also works full-time as a sewing machine operator at UNICOR, a correctional program aiming to help inmates successfully transition back to society, and resides in UNICOR housing.[22]  The United States does not dispute these efforts.

**C.      Mr. Harris's release plan.**

Mr. Harris plans to live in Philadelphia with his sister if he is granted compassionate release.[23] Our officer visited the residence and met with his sister. She welcomes her older brother to her two-bedroom residence.  Our officer found the property suitable for supervised release.  He swore to us of plans to contact a friend who assured him of available work for Federal Express near the Philadelphia airport, which will provide him with health insurance and other benefits.[24]  The United States did not challenge these findings.

**D.      COVID-19 affecting FCI-Fort Dix inmates and staff members.**

Mr. Harris describes at length dire conditions at FCI-Fort Dix caused by the spread of "coronavirus disease 2019," also known as COVID-19. As we understand today from our own review, COVID-19 is a respiratory disease spreading mainly through droplets produced when an infectious person, even one who is asymptomatic, talks, coughs, or sneezes.[25] The virus can also be spread through the air.[26] The practice of social distancing – staying six feet away from others – can help reduce the spread of the virus.[27]

COVID-19 poses a serious global public health risk. As of December 31, 2020, the Centers for Disease Control and Prevention reported a total of 19,432,125 cases of COVID-19 in the United States with 337,419 total deaths caused by the virus.[28] People of any age with the following conditions *are* at increased risk of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); down syndrome; immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m2 or higher); heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; pregnancy; a history of smoking; and Type 2 diabetes mellitus.[29] People of any age with the following conditions *might* be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pulmonary fibrosis (having damaged or scarred lung tissues); neurologic conditions (like dementia); liver disease; a

body mass index greater than 25 kg/m2; pulmonary fibrosis; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.[30]

Mindful correctional facilities face unique challenges in controlling the transmission of COVID-19, the Centers for Disease Control has issued guidance to prisons and correctional facilities to help them prevent the spread of COVID-19.[31] Following this guidance, the Bureau of Prisons adopted aggressive safety measures, assuring "maintaining safety and security of [its] institutions is [its] highest priority."[32] Despite these efforts, some correctional facilities, like FCI-Fort Dix, have recently experienced outbreaks of the virus among inmates and staff members. As of December 31, 2020, FCI-Fort Dix reports it has 453 confirmed active COVID-19 cases – 442 inmates and eleven staff members – in an inmate population of 2,595.[33] Since the outbreak began, the Bureau of Prisons has confirmed 942 COVID-19 cases at FCI-Fort Dix having administered tests to 2,134 inmates.[34]

### E.    Mr. Harris's health.

Mr. Harris is overweight.[35]  His medical records confirm he weighed 213.0 pounds and had a body mass index of 28.9 as of February 21, 2020.[36]   The facility recently placed him in quarantine as one of the other men on his block tested positive for COVID-19.  We have no evidence of his testing positive for COVID-19 or of his continued quarantine status as of today.

### F.    Mr. Harris exhausted his internal remedies.

Mr. Harris exhausted his remedies within the Bureau of Prisons. He submitted his request for compassionate release to the Warden of FCI-Fort Dix on June 29, 2020.[37] He moved for his release on August 27, 2020 over thirty days after he did not receive a response from the Warden.[38]

## II.    Analysis

Mr. Harris moved *pro se* for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A), arguing the change in sentencing for section 924(c) firearms crimes after passage of the First Step Act, his significant rehabilitation, and the general threat posed by COVID-19 constitute "extraordinary and compelling reasons" warranting a reduction in his sentence to time served.[39] The Federal Community Defender Office submitted a supplemental brief in support of Mr. Harris's release, principally arguing the unfairness of his sentence following the amendment to section 924(c) as Mr. Harris's sentence would be fifteen years if sentenced today.[40]

The United States opposes Mr. Harris's release.[41] It concedes many judges grant compassionate release for petitioners with stacked sentences for 924(c) crimes but notes many other judges declined to consider this change in sentencing law in compassionate release motions.[42] It argues Mr. Harris "in effect, is seeking retroactive application of section 403 of the First Step Act of 2018," which Congress decidedly did not make retroactive.[43] The United States notes this issue is currently pending before our Court of Appeals in *United States v. Andrews*, No. 20-2768, and asks we stay Mr. Harris's motion or his release pending its resolution.[44]

Congress allows us to reduce a sentence through compassionate release if we determine: (1) the incarcerated movant meets administrative exhaustion requirements, (2) "extraordinary and compelling reasons" warrant a reduction, (3) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (4) the applicable sentencing factors under 18 U.S.C. §3553(a) warrant a reduction.[45] The applicable policy statements issued by the Sentencing Commission urge us to consider whether Mr. Harris would be a danger to the community if released.[46]

7

Congress did not define "extraordinary and compelling reasons" except to provide "rehabilitation. . . alone" does not suffice.[47] It left the definition to the Sentencing Commission. Before Congress' amendment of section 3582(c)(1)(A) in December 2018, the Sentencing Commission issued commentary to its policy statement providing four categories of "extraordinary and compelling reasons."[48] The first three categories involve incarcerated persons who (1) are suffering from terminal illnesses or other severe medical conditions; (2) are at least sixty-five years old and have served a significant portion of their sentence; or (3) have family circumstances where the primary caregiver of their minor children dies or becomes incapacitated, or they are the only available caregiver of their spouse or registered partner.[49]

Mr. Harris's present condition does not meet the first three categories. Mr. Harris argues he presents extraordinary and compelling reasons for release under Note 1(D), or the fourth "catchall" provision: "Other reasons – As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in" the previous three categories.[50]

Like many of our colleagues, we reviewed several compassionate release motions since the First Step Act and even more after the COVID-19 outbreaks in our correctional facilities. Our Court of Appeals has confirmed the section 924(c) amendment is not retroactive as a matter of sentencing policy.  We do not understand Congress to have abrogated all section 924(c) sentences which might be lower if sentenced today.  We also disagree with the theory we can simply quasi-legislate and grant compassionate release based only on finding Congress' amended section 924(c) is an extraordinary and compelling reason for release.  But as we reasoned over five months ago in *United States v. Adeyemi*, we view the issue as whether courts may independently determine "other" extraordinary and compelling reasons warranting

compassionate release under the catchall provision and, consistent with a majority of judges, concluded we do have this authority.[51] But we need to anchor this discretion in reasoning long recognized by the Sentencing Commission and Bureau of Prisons.  We cannot simply make it up. We reasoned the Sentencing Commission has lacked a quorum of members to alter its outdated policy statement – which limits various determinations to the Director of the Bureau of Prisons – to reflect the First Step Act's grant of concurrent authority over compassionate release motions to courts.[52] We concluded the Sentencing Commission's failure to update its guidance should not, and does not, hamstring district courts' ability to independently determine extraordinary and compelling reasons for release under the catchall provision if based on an established series of factors.[53]

Since *Adeyemi*, the Court of Appeals for the Second Circuit likewise concluded the Sentencing Commission's policy statement is "clearly outdated" and conflicts with the First Step Act.[54] It held the policy statement's language only limits courts' discretion in evaluating motions for compassionate release made by the Bureau of Prisons, not motions made by incarcerated persons.[55] It held district courts are therefore "free[] . . . to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."[56] The Courts of Appeals for the Fourth, Sixth, and Seventh Circuits reached similar conclusions.[57]

As we find we may look to other reasons beyond the three defined by the Sentencing Commission before the 2018 changes to sentencing policy in the First Step Act, we must now determine whether Mr. Harris's arguments for release – his exposure to COVID-19 at FCI-Fort Dix as an almost-obese man, his lengthy sentence under a now-inapplicable sentencing policy, and his significant rehabilitation – constitute extraordinary and compelling reasons for his release

under the Sentencing Commission's catchall provision. We conclude his generalized fear of contracting COVID-19 does not warrant his release, but his lengthy sentence created by the mandated stacking of sentences rejected by Congress in December 2018, when combined with his body mass index and significant evidence of rehabilitation, his young age at the time of the offenses, and the over twenty three years already served in prison, constitute extraordinary and compelling circumstances warranting his release.

###    A.    Mr. Harris's generalized fear of contracting COVID-19 at FCI-Fort Dix does not constitute an extraordinary and compelling reason for his release.

Mr. Harris argues in his *pro se* motion he is at a high risk of contracting COVID-19 "simply by his presence in [FCI-Fort Dix]," and describes at length the conditions in FCI Fort Dix and the Bureau of Prisons' response to the virus.[58] During our hearing, Mr. Harris swore a man on his unit tested positive for COVID-19, Mr. Harris felt symptoms of COVID-19, the facility tested him and his test returned negative.  The Federal Defender argued Mr. Harris's body mass index of 28.9, falling at the high end of the "overweight" category and at the cusp of obesity, increases his risk of severe illness due to COVID-19. Mr. Harris's counsel argues this risk should not be minimized just because Mr. Harris falls a little short of being classified as obese.[59] The United States did not dispute the unfortunate arbitrary nature of these nuanced distinctions between overweight and obese individuals but argued Mr. Harris's body mass index does not definitively place him at a higher risk of severe illness from the virus. Mr. Harris's increased body mass index alone does not constitute an extraordinary and compelling reason for his release but it does warrant consideration as one factor in this analysis.

While we do not underestimate the seriousness of the global pandemic, especially within the prison population, a generalized fear of contracting the virus is insufficient to warrant a reduction in sentence. Our Court of Appeals instructed "the mere existence of COVID-19 in

society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."[60] Petitioners seeking compassionate release due to COVID-19 therefore "must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held."[61] Mr. Harris demonstrates an actual non-speculative risk based on a positive test in his unit and his symptoms.  But his test is confirmed negative and we have no evidence of ongoing illness.

Judges in this District have denied compassionate release to obese individuals who do not exhibit any other serious risk factors or complications. In *United States v. Williams*, for example, Judge Pratter held a petitioner with mild asthma and a body mass index of 31.5 did not present extraordinary and compelling reasons for his release during the pandemic.[62] While Judge Pratter recognized the Centers for Disease Control identified individuals with a body mass index over 30 as being at an increased risk of severe illness from the virus, she found the prison seemed to adequately manage petitioner's medical conditions and explained "the fact that [petitioner] suffers from obesity during the age of the COVID-19 pandemic does not necessarily mean, on its own, that extraordinary and compelling reasons justify the reduction of his sentence."[63] Earlier this month, Judge Pappert denied compassionate release to an obese petitioner with a thyroid tumor and resolved asthma because, as in *Williams*, petitioner failed to show any other risk factors or complications arising from his obesity while incarcerated.[64]

We similarly find Mr. Harris's increased body mass index is insufficient on its own to warrant his early release. His medical records show only he is overweight.[65] The Centers for Disease Control tell us overweight individuals like Mr. Harris *might* be an increased risk of

illness due to COVID-19. His medical records do not reveal another medical condition increasing his risk of severe illness from the virus. Mr. Harris falls short of even the petitioners denied compassionate release by Judges Pratter and Pappert. The mere potential for increased risk is not enough, standing alone, to warrant Mr. Harris's compassionate release. Courts decline to find COVID-19 an extraordinary and compelling reason for release without this showing of increased susceptibility to the virus.[66] We must do the same here.

**B.      Mr. Harris's lengthy sentence due to stacking of section 924(c) firearm charges is a relevant consideration and, when combined with evidence of rehabilitation, his health risks, and the significant time incarcerated, constitutes an extraordinary and compelling reason warranting his release.**

Mr. Harris further argues his stacked sentence under the abrogated version of section 924(c), when combined with other factors, constitute an extraordinary and compelling reason for his early release. The United States opposes, arguing: Congress did not make the change to section 924(c) retroactive, barring us from considering the change by acting as a quasi-legislative body; we found over five months ago in *Adeyemi* the stacking of sentences under section 924(c) does not, by itself, constitute an extraordinary and compelling reason for release; and, the issue of the effect of stacked sentences on our evaluation of an extraordinary and compelling reasons is currently pending in our Court of Appeals, and we (along with Mr. Harris in jail) should wait until it is resolved.

We first consider the impact the section 924(c) amendments would have had on Mr. Harris's sentence. If we sentenced Mr. Harris today, he would not face the mandatory consecutive sentence for a second section 924(c) firearm charge in the same case. But at the time of Mr. Harris's sentencing, Congress mandated a five-year sentence for the first possession of a firearm in furtherance of a crime of violence under 924(c) and a mandatory minimum consecutive sentence of twenty years for the second 924(c) crime, even if the second crime

occurred in the same case. Because Mr. Harris pled guilty to two robberies on March 6, 1998 – despite the robberies occurring over one month apart – the then-existing law required Judge Hutton impose the five-year sentence for the first possession of a firearm in furtherance of a crime of violence and a mandatory consecutive twenty-year sentence for the second possession of a firearm in furtherance of a crime of violence.

In December 2018, Congress amended section 924(c) to ensure the twenty-year consecutive term for a successive section 924(c) offense does not apply unless the defendant had a previous, final section 924(c) conviction at the time of the offense.[67] So instead of the 357-month sentence Mr. Harris currently serves, he would be sentenced to a minimum 177-month sentence today. Mr. Harris argues this fifteen-year disparity between the sentence he is currently serving and the sentence he would face if sentenced today constitutes an extraordinary and compelling reason for his release.

Despite these sentence disparities between those sentenced before and after the First Step Act, Congress expressly declined to make this change to section 924(c) retroactive as part of a sentencing analysis.[68]  We have a different question concerning the effect of the section 924(c) amendment. District courts have split regarding the impact of Congress' decision against retroactivity on compassionate release motions, with some judges concluding we may not consider arguments involving the amendment to section 924(c) at all,[69] while others found the opposite – a sentence disparity created by the amendment to section 924(c) may constitute an extraordinary and compelling reason for release.[70] Many courts have joined us somewhere in the middle, finding this change in sentencing law is a relevant consideration in compassionate release motions, but cannot constitute an extraordinary and compelling reason for release on its own.

As the United States notes, we analyzed the impact of Congress' decision not to make the amendment to section 924(c) retroactive almost six months ago in *United States v. Adeyemi*. In *Adeyemi*, the petitioner argued, as Mr. Harris does here, a sentencing disparity created by the amendment to section 924(c), combined with other factors, constituted an extraordinary and compelling reason for release under the catchall provision.[71] After careful review of the First Step Act and persuasive case law existing at the time, we found Congress' directive to not make the amendment to section 924(c) retroactive did not preclude courts' ability to consider the inequities in stacking as an argument for compassionate release because while "[a] retroactive amendment to section 924(c) would have required the release of all defendants similarly situated to [petitioner]," compassionate release motions only allow for sentence reductions "on an individualized basis, only in the most extraordinary circumstances and only if the defendant meets specific criteria such as the 3553(a) factors and would not endanger the community."[72] We reasoned this conclusion aligned with the First Step Act's intent in expanding courts' involvement in compassionate release motions.[73]   We cannot presume Congress precluded judges from considering stacking inequities in individual cases.  Congress' decision to not expressly define its amendments as retroactive can also be understood as avoiding a blanket release for all stacking sentences.

We also concluded, however, the amendment to section 924(c) could not singularly constitute an extraordinary and compelling reason warranting compassionate release because we "cannot play the role of legislator."[74] In granting compassionate release in *Adeyemi*, we found petitioner presented other factors supporting his release, which, when combined, constituted extraordinary and compelling reasons.[75] We found it significant, for example, petitioner spent his almost fourteen years in prison productively by working for UNICOR, taking numerous

business, self-improvement, art, and health courses, and avoiding any serious disciplinary infractions.[76] We also found the fact petitioner served a significant portion of his sentence and committed the offenses at a young age weighed in favor of finding extraordinary and compelling reasons for his release.[77]

As the United States admits, since *Adeyemi*, an increasing number of judges – including in this District – have similarly found the stacking of sentences under section 924(c) to be a relevant consideration in analyzing compassionate release motions, though not sufficient on its own to warrant release. These judges have found extraordinary and compelling reasons for a sentence reduction based on a combination of rehabilitation and the sentencing disparity created by the amendment to section 924(c). In *United States v. Pollard*, for example, Judge Beetlestone found extraordinary and compelling reasons warranted petitioner's release under the catchall provision where petitioner's primary argument focused on the substantially shorter mandatory minimum sentence he would have faced if sentenced today because of the change to section 924(c).[78] Petitioner, who faced a mandatory minimum sentence of 384 months prior to the First Step Act, argued he would only be sentenced to a 168-month sentence today.[79] Judge Beetlestone concluded, as we did in *Adeyemi*, she could consider this sentencing disparity in her analysis because, although Congress chose not to grant all defendants convicted under the defunct version of section 924(c) reductions in their sentences, "[i]t is reasonable for Congress to have concluded. . . some may be entitled to such [relief], on a case-by-case basis – through the expanded compassionate release provision provided for in the [First Step Act]."[80] She explained the Senate Report accompanying the Sentencing Reform Act of 1984 – the Act initially authorizing the Bureau of Prisons to evaluate compassionate release motions – furthered her conclusion:

In that report, Congress indicated that relief may be appropriate, *inter alia*, in "cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment." Thus, Congress explicitly contemplated that changes to the length of a sentence can be an appropriate consideration in deciding whether to grant compassionate release.[81]

In addition to the stacking argument, Judge Beetlestone found it significant petitioner pointed to other factors in support of his release, including evidence of significant rehabilitation through his various jobs, participation in recreational activities and religious services, and overall productivity while incarcerated.[82] The petitioner also had concrete plans for employment upon release.[83] She found all of these factors – the significantly shorter sentence he would face if sentenced today, his rehabilitation, his plans for gainful employment upon release, and his lack of a prior criminal history – when combined constituted extraordinary and compelling reasons for his early release.[84]

Judge Pappert reduced a 213-year sentence based on the significant sentencing disparity created by the section 924(c) amendments combined with compelling evidence of rehabilitation – including completion of over 100 educational programs, creation and facilitation of prison reentry programs, and receipt of certification as a life coach – while incarcerated.[85] Judge Pappert, like Judge Beetlestone, concluded consideration of petitioner's extraordinarily lengthy sentence, resulting from nine firearm convictions stacked on one another, may be a factor in granting compassionate release and did not amount to retroactive application of the section 924(c) amendments because, in his view, Congress did not preclude the ability of courts to relieve some prisoners of these sentences through compassionate release.[86]

In *United States v. McCoy*, the United States Court of Appeals for the Fourth Circuit – the first appellate court to address compassionate release focused on the section 924(c) stacking

issue – recently added to this weight of authority by holding district courts appropriately considered "the sheer and unusual length of [petitioners'] sentences" and the "gross disparity between those sentences and the sentences Congress now believes to be an appropriate penalty for the [petitioners'] conduct" in granting compassionate release in four cases.[87] In affirming the district courts' decisions as to four petitioners, the court of appeals emphasized the individualized nature of the inquiries made by the trial judges, which "relied not only on the [petitioners'] § 924(c) sentences but on full consideration of the defendants' individual circumstances," including petitioners' young age at the time of the offenses, the substantial sentences the petitioners already served, and evidence of rehabilitation.[88] The Court of Appeals for the Fourth Circuit further rejected the United States' argument (repeated today) consideration of sentence disparities created by the section 924(c) amendment in compassionate release amounted to its retroactive application, explaining "there is a significant difference between automatic vacatur and resentencing of an entire class of sentences – with its avalanche of applications and inevitable resentencings – and allowing for the provision of individual relief in the most grievous cases."[89]

Other district courts have similarly granted reductions in sentences where the petitioner argued their stacked sentences – combined with some other factor(s) – constituted extraordinary and compelling reasons for their release. In *United States v. Jones*, for example, Judge Davila joined "the growing majority of courts" in reducing a sentence in part because of the fifteen-year disparity in petitioner's sentence created by the change to section 924(c).[90] He rejected the argument that Congress' decision against retroactivity precluded his ability to consider the sentencing disparity created by the amendment, finding instead the amendment "reflects a legislative rejection of stacking and a legislative declaration of what level of punishment is

adequate" for section 924(c) firearm offenses.[91] He further found it significant that "the very purpose of § 3582(c)(1) is to permit sentence reductions in situations where no specific statute affords a defendant relief but 'extraordinary and compelling reasons' nevertheless call for such a reduction."[92] Judge Davila found this change in sentencing law, when combined with petitioner's rehabilitative efforts and other factors, warranted petitioner's early release.[93]

We are aware of Judge Robreno's analysis in *Andrews* and the present appeal of his holding denying a compassionate release motion based on, among other factors, the amendment to section 924(c).[94] We agree with Judge Robreno's conclusion district courts are not, when evaluating compassionate release motions brought by defendants, bound by the Sentencing Commission's policy statement enumerating specific extraordinary and compelling reasons warranting release.[95] This sound reading of federal sentencing law has since been substantiated by four Courts of Appeals. We do not agree, however, with the conclusion in *Andrews* the length of petitioners' sentences cannot be considered in compassionate release motions because to do so would amount to a usurpation of Congress' power to set penalties.[96] As Judge Beetlestone reasons in *Pollard*, Congress expressly indicated compassionate release may be appropriate based on the length of a sentence.[97] The Senate Report accompanying the Sentencing Reform Act of 1984 stated a reduction in sentence may be appropriate in cases involving an "unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment."[98] Congress, over twenty-five years ago, contemplated length of sentence as a factor in some compassionate release cases.[99]

We also disagree with conclusion in *Andrews* considering the amendment to section 924(c) in this individualized way usurps Congress' ability to determine the temporal scope of its

statutes.[100] We recognize Congress chose not to make this amendment retroactive; if it had, all individuals sentenced under the previous version of section 924(c) automatically would be entitled to sentence reductions. As the Court of Appeals for the Fourth Circuit found in *McCoy*, it does not necessarily follow Congress meant to foreclose the possibility of its consideration at all in any context, even the individualized analysis involved in compassionate release. To find it categorically forecloses such considerations would undermine our mandate to impose sentences "sufficient, but not greater than necessary" under the unique circumstances of each case.[101] It also conflicts with the First Step Act's broader purpose in allowing district courts to conduct an "individualized assessment" of a petitioner's case and approve a sentence reduction if warranted under the circumstances.[102]

We agree with the analyses of the Courts of Appeals in *Brooker*, *Jones*, *Gunn, and McCoy* allowing us to consider "other" reasons in evaluating compassionate release motions brought by petitioners.  When we do so, we agree with the Courts of Appeals, as well as the sound reasoning from Judges Beetlestone, Pappert, and Davila and find they lend further support to our conclusion in *Adeyemi* that while the First Step Act's change to section 924(c) does not constitute an extraordinary and compelling reason on its own, Congress did not intend to categorically preclude courts from considering sentencing disparities created by the amendment to section 924(c) altogether. We find a case-by-case analysis mandated by Congress' grant of authority given to judges in the First Step Act strikes the correct balance of interpreting the First Step Act consistent with its legislative intent in expanding the use of – and the courts' involvement in – compassionate release motions, while remaining mindful of significant separation of powers concerns.[103]  But we also must anchor our analysis to established factors to avoid arbitrary disposition of these life-changing motions.

### C.   Mr. Harris's circumstances fulfill the Bureau of Prisons' Program Statement enumerating factors determining "other" extraordinary and compelling reasons.

Having concluded the fifteen-year sentence disparity created by the amendment to section 924(c) is a relevant consideration, but not sufficient on its own to warrant a sentence reduction, we next consider whether Mr. Harris demonstrated any "other" factors for release under the catchall provision – outside of health, age, or family reasons – "as determined by the Director of the Bureau of Prisons."[104] As we found above, we are no longer bound to the Bureau of Prisons' determinations following passage of the First Step Act.  But consistent with sentencing policy as of today, we apply the established factors the Bureau of Prisons employs when evaluating requests for compassionate release under the catchall provision.

We look to the Bureau of Prisons' Program Statement 5050.50 to find factors it considers in evaluating compassionate release requests, as we did in *Adeyemi*.[105] The program statement – issued <u>after</u> the passage of the First Step Act – provides guidance in evaluating compassionate release requests involving medical issues, elderly inmates, and family circumstances.[106] It also lists thirteen non-exclusive factors to consider for "all [compassionate release] requests."[107] Although these factors do not specifically apply to compassionate release requests made under the catchall provision, we agree with the Court of Appeals for the Tenth Circuit they can be used to evaluate such requests.[108] This conclusion is furthered by the structure of the program statement – these thirteen factors are listed immediately following guidance as to the first three extraordinary and compelling reasons defined by the Sentencing Commission.

The thirteen factors enumerated by the Bureau of Prisons are: nature and circumstances of the inmate's offense, criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustment, disciplinary infractions, personal history

derived from the presentence investigation report, length of sentence and amount of time served, inmate's current age, inmate's age at the time of the offense and sentencing, inmate's release plans, and whether release would minimize the severity of the offense.[109]

During oral argument, Mr. Harris's counsel argued consideration of each of factors enumerated in the program statement weighs in favor of his early release. The United States argued instead we cannot consider these factors at all. It argued the program statement applies only after the Director of the Bureau of Prisons made a threshold finding extraordinary and compelling reasons exist based on the Sentencing Commission's three enumerated reasons relating to medical issues, age, or family circumstances.

We disagree with the United States' interpretation of the program statement. The program statement instructs the Director of the Bureau of Prisons consider the thirteen factors listed above "to assess whether the [reduction in sentence] request presents particularly extraordinary and compelling circumstances."[110] A plain reading of this text contradicts the United States' argument these factors may only be considered upon a threshold finding of extraordinary and compelling reasons. We conclude, as we did in *Adeyemi*, we may use these factors promulgated by the Bureau of Prisons itself to determine whether Mr. Harris presents "other" factors warranting his release under the catchall provision.

After careful consideration of each of these factors, and consistent with the Court of Appeals for the Fourth Circuit, Judges Beetlestone and Pappert, and a number of other district court judges, we find the drastically different sentence he would have received for his crimes if sentenced today, when combined with evidence he is a significantly changed individual, his relatively young age at the time of the offenses, and the substantial sentence he has already served, constitutes an extraordinary and compelling reason for his early release.[111]

The nature of Mr. Harris's armed robberies is undoubtedly serious. Mr. Harris brandished a gun during each robbery, although he never fired one and claims he never would have shot anyone. At the time of his sentencing, Mr. Harris also had convictions for a drug offense and two other armed robberies. While we do not diminish the seriousness of these crimes, our consideration of Mr. Harris's history and characteristics "is not frozen in time."[112] We find it significant Mr. Harris's crimes admittedly stemmed from a drug addiction he had over twenty years ago.

The Bureau of Prisons Program Statement next instructs we consider comments from victims. The probation office informed the two soda delivery truck drivers Mr. Harris pled guilty to the robberies, but neither victim responded under the provisions of the Mandatory Victim Restitution Act.  We cannot fairly weigh this factor when the victims do not offer comments.

We are also instructed to consider any unresolved detainers. The presentence investigation report displays no detainers on Mr. Harris.

We next consider any supervised release violations. Mr. Harris committed the robberies while on a three-year term of reporting probation for a drug offense. This factor weighs against Mr. Harris's release.

Under the Bureau of Prisons's next enumerated factor, we consider institutional adjustment. Mr. Harris has demonstrated significant rehabilitation in his nearly twenty-four years in prison.  He represents this changed behavior has resulted in the Bureau of Prisons moving from him from a high security prison to FCI-Fort Dix, a low security facility. He maintains full-time employment at FCI-Dix as a sewing machine operator for UNICOR and resides in UNICOR housing. Mr. Harris's educational transcript shows he has completed numerous educational programs over an almost ten-year-period in valuable fields such as parenting (forty

hours), victim impact (twenty-four hours), freedom from drugs (thirteen hours), and ethics (ten hours). His transcript also evidences his ability and desire to gain skills for a productive future. Mr. Harris, for example, obtained an associate certification in electronics by completing 320 hours of coursework in a little over one year. He completed various workshops in professionalism, time management, teamwork, interviewing, and job searching. He tells us, in addition to these courses, he is currently enrolled in courses involving financial literacy and business mathematics. This substantial evidence weighs in favor of his release and convinces us Mr. Harris is no longer the twenty-four-year-old who committed robberies primarily for drug money; he is now an almost fifty-year-old man who – after spending almost half of his life in jail– has worked towards a law-abiding future. We also consider Mr. Harris's concerns about his health due to the presence of COVID-19 at FCI Fort Dix. Mr. Harris is overweight with a body mass index of 28.9. If Mr. Harris's body mass index increased to 30.0, he would be considered obese. The Centers for Disease Control tells us overweight individuals might be at an increased risk of severe illness from COVID-19, while obese individuals definitively face an increased risk of severe illness. Despite these categorizations, the Centers for Disease Control also instructs "[a]s [body mass index] increases, the risk of death from COVID-19 increases."[113] Continued imprisonment could make it more difficult for Mr. Harris to maintain a healthy weight and put Mr. Harris at a higher risk of severe illness from COVID-19.[114]

The next factor to consider is disciplinary infractions. During Mr. Harris's over twenty-three years in prison, he had only a few disciplinary infractions. As the United States concedes, Mr. Harris has maintained a clean record for thirteen years. These thirteen years of good conduct further evidence his changed behavior and weighs in favor of his release.

We next consider Mr. Harris's personal history. At a young age and shortly after his parents separated, Mr. Harris began experiencing substance abuse issues. He admittedly began "robbing people" to support his drug habit. In the over twenty years since these robberies, Mr. Harris has worked to improve himself and has taken various educational courses and workshops, including in subjects like drug education.

Consideration of the length of Mr. Harris's sentence and the amount of time served weighs heavily in favor of his early release. Judge Hutton sentenced Mr. Harris to 357 months' imprisonment; much of this lengthy sentence resulted from stacked mandatory minimum sentences imposed on his firearm convictions. Mr. Harris has served over 258 months – over 70% – of this sentence. As in *Adeyemi*, Mr. Harris "serves a sentence which would never be imposed under current law."[115] The parties agree Mr. Harris would have received a 177-month sentence under current law. Mr. Harris has already served many more months, even years, than he would need to if sentenced today, weighing in favor of his release.

We consider Mr. Harris's young age at the time of the offenses and his current age and find they also weigh in favor of his release. Mr. Harris committed the robberies under the age of twenty-five; this young age "indicates less culpability and enhances the possibility of rehabilitation."[116]  Mr. Harris provided us with significant evidence of rehabilitation during the latter half of his life. He is now almost fifty years old and is statistically much less likely to recidivate.[117]

We next consider Mr. Harris's release plans.  We told counsel during oral argument of our concern with two earlier plans involving living at either a friend's house and then with an aunt and uncle.  Our officers visited the one location and found it uninhabitable for Mr. Harris. Mr. Harris then arranged to live with his sister in Philadelphia.  Our officers investigated and

found the residence suitable for initial quarantine, followed by home confinement with monitoring, and then two years of completing his supervised release. Mr. Harris's reconsidered plan weighs in favor of release.

We lastly must consider whether Mr. Harris's release would minimize the severity of the offense. His release would not minimize the severity of the offense because Congress, in passing the First Step Act and amending sentencing for section 924(c) offenses, renounced the harshness of lengthy stacked sentences like Mr. Harris's. Mr. Harris could have been sentenced to fifteen years less had he been sentenced after the First Step Act, so "[n]ot only would [Mr. Harris's] release not minimize the severity of the offense, it would also comply with Congressional directives on the appropriateness of sentences under section 924(c)."[118]

After careful consideration of each factor enumerated by the Bureau of Prisons's program statement, we conclude Mr. Harris's substantial evidence of rehabilitation, his young age at the time of the offenses, and the substantial portion of his sentence he has already served, when combined with the fifteen-year shorter sentence he would have received if sentenced after the First Step Act, constitute an extraordinary and compelling reason for his release.

### D. Mr. Harris's time-served sentence is consistent with Congress' sentencing factors.

Our analysis does not end with finding an extraordinary and compelling reason for Mr. Harris's release. We must weigh this reason against the section 3553(a) factors set by Congress to determine if a sentence reduction is warranted and the extent of a reduction. The applicable sentencing factors we must consider include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes,

and provide the defendant with needed educational training or other correctional treatment; and (3) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct.[119] "[E]vidence of postsentencing rehabilitation may be highly relevant" to our consideration of several of these factors.[120] After careful consideration of these factors, we find they weigh in favor of Mr. Harris's time-served sentence at this stage.

Courts have found consideration of section 3553(a) factors supported sentence reductions under circumstances similar to Mr. Harris's facts. In *United States v. Redrick*, for example, Judge Rufe found, despite petitioner's serious crimes and criminal history, petitioner's history and characteristics "greatly favor[ed]" a sentence reduction because of his rehabilitative efforts, including completing dozens of educational and development courses, obtaining certificates in various areas, and participating in a program to assist inmates considering self-harm and suicide.[121] In *United States v. Lott*, Judge Hayes found consideration of the sentencing factors weighed in favor of petitioner's early release because, although petitioner's offenses involved violent conduct, they involved decisions by a twenty-two year old person over twenty-eight years ago.[122] Since the offenses, petitioner engaged in vocational training as an electrician, as well as general education and improvement programming, and had not had any disciplinary issues.[123] Judge Perry in *United States v. Littrell* similarly found the section 3553(a) factors weighed in favor of a petitioner's release where petitioner committed drug-related firearm offenses many years ago due to a drug addiction.[124] Petitioner had since demonstrated good behavior in his over fifteen years in prison, moved to a low security classification, and completed his GED and other courses.[125]

We are presented with similar evidence of rehabilitation here. Mr. Harris, who has now spent almost half of his life in prison, demonstrated significant progress towards becoming a

productive, law-abiding citizen upon release. He obtained his GED and completed numerous educational courses, including a thirteen-hour course in drug education, demonstrating Mr. Harris's interest, ability, and willingness to pursue a drug-free and crime-free future. He maintained years of employment in UNICOR during his incarceration and plans on finding gainful employment upon release. He further dedicated over 300 hours to obtaining a certification in electronic technology, which could aid Mr. Harris in finding future employment. Along with his productive and positive behavior in prison, he is now almost fifty years old and statistically much less likely to recidivate.[126] We conclude the second-half of Mr. Harris's life provides "the most up-to-date picture" of his character and weighs in favor of his release.[127]

We next consider the need for the sentence imposed, including the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and find the twenty-three years Mr. Harris has spent incarcerated satisfies these needs. We find it significant the nearly thirty-year-sentence imposed on Mr. Harris "did not result from any individualized consideration of his background and characteristics" but instead resulted from a now-defunct statutory mandate of stacked mandatory minimum sentences, "which did not permit the court to consider personal circumstances in its sentencing analysis."[128] Mr. Harris already spent more time incarcerated than he would be required to if sentenced today, and has made many positive changes during this time. We find, consistent with numerous judges, twenty-three years is a substantial punishment for Mr. Harris's serious crimes and readily fulfills the goals of deterrence, respect for the law, and safety to the community.[129]

We further find consideration of unwarranted sentence disparities weigh in favor of Mr. Harris's release on a time served sentence. As we explained above, Mr. Harris's lengthy sentence is the result of the outdated and "draconian practice" of stacking sentences within the

same prosecution, and indeed, he would have already been released if sentenced today.[130] In *Pollard*, Judge Beetlestone found this factor weighed in favor of reducing a lengthy sentence caused by stacking 924(c) convictions because petitioner "is now serving a sentence longer than even the mandatory minimum that others who committed the same crimes as he did would be facing if sentenced today" and further found reducing the sentence "would not create any unwarranted disparities—and indeed, would help avoid them."[131]

      **E.**      **Releasing Mr. Harris under specific supervised release terms to a suitable residence with his sister does not pose a danger to the safety of any other person or the community.**

We may reduce a sentence only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[132] Congress in section 3142(g) instructs us to consider factors such as the nature and circumstances of Mr. Harris's crimes; Mr. Harris's character, including his family ties, employment, and criminal history; and any danger posed to the community by his release.[133] Mr. Harris argues he will not pose a danger to the community if released and the United States does not argue otherwise. We agree Mr. Harris no longer poses a danger to the community or to others.

In *United States v. Nunez*, Chief Judge Sánchez found a petitioner with a criminal history who demonstrated significant rehabilitative efforts, including obtaining his GED, attempting to participate in a drug abuse program, and avoiding disciplinary issues, "is not a danger to the community as he once might have been."[134] He further found the petitioner's strict terms of supervised release would "sufficiently manage[]" any risk of petitioner engaging in further criminal conduct.[135] Judge Seeborg similarly found a petitioner with a significant criminal history would not pose a danger to community upon his release because petitioner committed the offenses many years ago at a young age, exhibited good behavior during his lengthy

incarceration, and no longer had a significant risk of recidivism due to his older age.[136] Judge Seeborg further found any risk petitioner may still pose would be mitigated by years of supervised release.[137]

Chief Judge Sánchez's and Judge Seeborg's analyses are instructive. Mr. Harris's crimes, although undoubtedly serious, occurred in his early twenties largely motivated by his drug addiction.  All of the adduced evidence confirms Mr. Harris, now almost fifty years old, is a much different man. He spent a significant amount of his time while incarcerated working as a sewing machine operator, completing valuable courses like drug education and parenting, and generally becoming a more productive member of society. This compelling evidence of rehabilitation spanning over twenty years, combined with his relatively low likelihood of recidivating, demonstrates he will not present a danger to the community upon release.

This finding is furthered by the strict conditions we will impose on Mr. Harris's three-year-term of supervised release.  We will not release Mr. Harris while he is in quarantine.  Upon leaving quarantine and immediate release to his sister's home in Philadelphia, we will prohibit Mr. Harris from possessing controlled substances, guns, or ammunition. He will periodically report to his probation officer for random drug tests. He will remain in his residence (or another residence approved by the Pretrial Services Officer) for the first twelve months except for work, medical, religious, or formal education.   He will need to secure and maintain regular employment.  Violating these conditions may result in Mr. Harris returning to federal prison. These restrictions will further reduce any risk Mr. Harris may pose to others or the community upon his release.

**F.      We decline to stay Mr. Harris's release pending our Court of Appeals' resolution of *Andrews*.**

The United States requests we stay release pending our Court of Appeals's resolution of *Andrews*.  We decline to do so.

We disagree Mr. Harris's eligibility for relief turns on our Court of Appeals' resolution in the pending *Andrews* appeal.  Since the court's decision in *Andrews*, four Courts of Appeals have held district courts have the authority to consider the "full slate" of reasons a petitioner presents for compassionate release under the catchall provision.  As our reasons in *Ayedemi* previewed, we agree with the reasoning of the four Courts of Appeals none of whom had issued their opinions before *Andrews*  The court's decision in *Andrews* also did not have the benefit of the Court of Appeals for the Fourth Circuit's more specific analysis in *McCoy* reasoning  the section 924(c) amendment is part of the equation in determining whether the petitioner  demonstrated an extraordinary and compelling reason for compassionate release.  This substantial weight of uniform persuasive authority is before our Court of Appeals.

Mr. Harris is not the ordinary case.  We impose strict home confinement conditions during the first year of his supervised release to ensure he remains in our District and our experienced Probation Officers can closely monitor him.  We cannot agree a stay leaving him in prison is just while he awaits a decision from our Court of Appeals in another incarcerated person's case.  Sentencing decisions are individual; what is appropriate for Mr. Andrews in his case is not automatically appropriate for Mr. Harris.  Mr. Andrews's legal issues on appeal appear to involve a binary analysis which, four Courts of Appeals and several of our colleagues have found not warranted.  We understand judges in other Circuits take a different view on distinct facts. We agree with *Andrews* in part but do not reach the same result given the individualized nature of Mr. Harris's present status.  Leaving Mr. Harris in prison for longer than

30

warranted by the circumstances is not, in our view, more consistent with sentencing policy than releasing him to his family in our District where our officers can closely supervise him. Spending one more day than necessary in jail for purposes of convenience is not consistent with the interests of justice under the facts presented today.

## III.    Conclusion

Mr. Harris demonstrates multiple extraordinary and compelling reasons for his compassionate release, including his extraordinary rehabilitation and personal growth while incarcerated combined with his having served a sentence far beyond our country's sentencing policy as Congress defined over two years ago.   We cannot ignore the flexibility in reducing sentences in these circumstances as Congress addressed in 1984 with renewed vitality in the 2018 First Step Act.  Mr. Harris satisfies our scrutiny under section 3553, and he does not pose a danger to the community by release to home confinement to start the next phase of his sentence through supervised release in this District working and restoring his post-incarceration life.

---

[1] February 11, 2001 Presentence Investigation Report, (PSR) ¶ 55.

[2] *Id.* ¶ 54.

[3] *Id.* ¶ 63.

[4] *Id.*  ¶¶ 64-65.

[5] *Id.* ¶ 62.

[6] *Id.* ¶¶ 9-12, 45.

[7] *Id.* ¶¶ 10, 12.

[8] ECF Doc. No. 1.

[9] ECF Doc. No. 24.

---

[10] ECF Doc. No. 43.

[11] June 26, 1998 Judgment, *United States v. Gordon*, No. 97-179-1 (E.D. Pa.), Dkt. No. 20.

[12] ECF Doc. No. 43 at 9:4-24.

[13] *Id.* at 3-5; Presentence Investigation Report, ¶¶ 47-50.

[14] ECF Doc. No. 43 at 4:4-5; September 9, 1998 Judgment, *Cmmw. v. Harris*, CP-51-CR-02000371-1997 (Pa. C.P. Philadelphia Cty), Dkt. No. 9639067394.

[15] ECF Doc. No. 43 at 11:8-10.

[16] *See* First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403.

[17] ECF Doc. No. 67 at 14.

[18] ECF Doc. No. 85 at 3.

[19] ECF Doc. No. 67 at 19.

[20] *Id.*

[21] *Id.* at 14.

[22] *Id.*; Bureau of Prisons, *Unicor*, https://www.bop.gov/inmates/custody_and_care/unicor.jsp (last visited Dec. 3, 2020).

[23] ECF Doc. No. 83 at 14. Mr. Harris originally represented he would live with a life-long friend upon his release. ECF Doc. No. 67 at 16.

[24] ECF Doc. No. 67 at 16.

[25] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Social Distancing: Keep a Safe Distance to Slow the Spread*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated Nov. 17, 2020).

[26] *Id.*

[27] *Id.*

[28] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *United States COVID-19 Cases and Deaths by State*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last updated Dec. 30, 2020).

[29] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html) (last updated Dec. 29, 2020).

[30] *Id.*

[31] Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19)*, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Dec. 3, 2020).

[32] Bureau of Prisons, *Updates to BOP Covid-19 Action Plan*, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last updated Mar. 19, 2020).

[33] Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/ coronavirus/ (last updated Dec. 30, 2020).

[34] Bureau of Prisons, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus/ (last updated Dec. 30, 2020).

[35] Centers for Disease Control, *Defining Adult Overweight and Obesity* (last visited Dec. 30, 2020), https://www.cdc.gov/obesity/adult/defining.html.

[36] ECF Doc. No. 79-1 at 10.

[37] ECF Doc. No. 67 at 20.

[38] ECF Doc. No. 67.

[39] *Id.*

[40] ECF Doc. No. 83.

[41] ECF Doc. No. 85.

[42] *Id.* at 6-13.

[43] *Id.* at 7.

[44] *Id.* at 12-13.

[45] 18 U.S.C. § 3582.

---

[46] *See, e.g., United States v. Slone*, No. 16-400, 2020 WL 3542196, at *8-9 (E.D. Pa. June 30, 2020).

[47] 28 U.S.C. § 994(t).

[48] U.S.S.G. § 1B1.13 cmt. n.1(A)-(D).

[49] *Id.*, cmt. n.1 (A)-(C).

[50] *Id.*, cmt. n.1 (D).

[51] 470 F. Supp. 3d 489, 503-10 (E.D. Pa. 2020).

[52] *Id.* at 509-10.

[53] *Id.* at 510.

[54] *United States v. Brooker*, 976 F. 3d 228, 234-37 (2d Cir. 2020).

[55] *Id.* at 235-36.

[56] *Id.* at 237.

[57] *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *7 (6th Cir. Nov. 20, 2020) (finding the Sentencing Commission's policy statement, specifically the catchall provision, does not apply to cases where an incarcerated person moves for compassionate release); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) (same); *United States v. McCoy*, 981 F.3d 271, 280-83 (4th Cir. 2020) (same).

[58] ECF Doc. No. 67 at 11.

[59] The Centers for Disease Control tells us Mr. Harris's body mass index of 28.9 falls short of being within the "obese" range because a body mass index between 25.0 and 30.0 falls within the "overweight" range, while a body mass index of 30.0 or higher is considered "obese." Centers for Disease Control, *Defining Adult Overweight and Obesity*, https://www.cdc.gov/obesity/adult/defining.html (last visited Dec. 30, 2020).

[60] *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

[61] *United States v. Moldover*, No. 14-637, 2020 WL 6731111, at *7 (E.D. Pa. Nov. 13, 2020) (citations and quotations omitted).

[62] No. 15-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17,  2020).

[63] *Id.*

34

[64] *United States v. Calloway*, Nos. 12-00540, 12-00358, 2020 WL 7480295, at *2 (E.D. Pa. Dec. 18, 2020).

[65] *See* ECF Doc. No. 79.

[66] *See, e.g., United States v. Buckman*, No. 14-540, 2020 WL 4201509, *3-4 (E.D. Pa. July 22, 2020) (finding forty-one-year-old petitioner failed to demonstrate extraordinary and compelling reasons for release because she did not suffer from serious medical condition placing her at a high risk for serious complications from COVID-19); *United States v. Cornish*, No. 17-208-2, 2020 WL 6870575, at *1-2 (E.D. Pa. Nov. 23, 2020) (denying epileptic petitioner's motion for compassionate release because he failed to show an increased risk of severe illness due to COVID-19).

[67] *See* First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403.

[68] *United States v. Wilson*, 960 F.3d 136, 151 (3d Cir. 2020) (citing *United States v. Hodge*, 948 F.3d 160, 162-64 (3d Cir. 2020)).

[69] *See, e.g., United States v. Andrews,* No. 05-280-02, 2020 WL 4812626, at *6-7 (E.D. Pa. Sept. 4, 2020) ("The length of the sentence cannot be an extraordinary and compelling reason to grant compassionate release because this would infringe on the legislature's province to fix penalties."); *United States v. Thacker*, No. 03-20004, 2020 WL 5960685, at *2-4 (C.D. Ill. Oct. 8, 2020) (declining to consider the amendment to section 924(c) as a basis for compassionate release "[b]ecause Congress has indicated that the relevant statute is not retroactive and because the compassionate relief guidelines focus on individualized health and family circumstances").

[70] *See, e.g., United States v. Scott*, No. 95-202-2, 2020 WL 2467425, at *2-3 (D. Md. May 13, 2020) ("The fact [petitioner], if sentenced today for the same conduct, would likely receive a dramatically lower sentence than the one he is currently serving, constitutes an 'extraordinary and compelling' reason justifying potential sentence reduction under § 3582(c)(1)(A)(i)."); *United States v. Arey*, 461 F. Supp. 3d 343, 349-50 (W.D. Va. 2020) ("[P]ursuant to its independent discretion, the court finds that [petitioner]'s continued incarceration under a sentencing scheme that has since been substantially amended is a permissible 'extraordinary and compelling' reason to consider a reduction in [petitioner]'s sentence.").

[71] 470 F. Supp. 3d at 518-25.

[72] *Id.* at 522.

[73] *Id.*

[74] *Id.* at 524.

[75] *Id.* at 525-29.

[76] *Id.* at 527.

---

[77] *Id.* at 528.

[78] No. 10-633-1, 2020 WL 4674126, at *6-7 (E.D. Pa. Aug. 12, 2020).

[79] *Id.* at *6 (citing *United States v. Maumau*, No. 08-758-11, 2020 WL 806121, at *6 (D. Utah Feb. 18, 2020) (citing S. Rep. No. 98-225, at 55-56 (1984))). The sentencing judge in *Pollard* sentenced petitioner to 180 months due to a significant departure for cooperation. *Id.*

[80] *Id.* (citing *Maumau*, 2020 WL 806121, at *7).

[81] *Id.* (citing *Maumau*, 2020 WL 806121, at *6) (citing S. Rep. No. 98-225, at 55-56 (1984))).

[82] *Id.* at *7.

[83] *Id.*

[84] *Id.*

[85] *United States v. Clausen*, No. 00-291-2, 2020 WL 4260795, at *7-8 (E.D. Pa. July 24, 2020).

[86] *Id.* at *7 (collecting district court cases concluding extraordinary and compelling reasons for compassionate release existed based on a combination of petitioner's rehabilitation and the change in sentencing under section 924(c)).

[87] 981 F.3d at 285-88.

[88] *Id.* at 286.

[89] *Id.* at 286-87 (citations and quotations omitted).

[90] No. 94-20079-1, 2020 WL 5359636, at *6-8 (N.D. Cal. Aug. 27, 2020).

[91] *Id.* at *8 (citations and quotations omitted).

[92] *Id.*

[93] *Id.* at *10.

[94] 2020 WL 4812626, at *5-15.

[95] *Id.* at *3-6.

[96] *Id.* at *7.

[97] 2020 WL 4674126, at *6.

[98] *Id.* (citing S. Rep. No. 98-225, at 55-56 (1984)).

[99] The Director of the Bureau of Prisons' Program Statement 5050.50 similarly identifies "length of sentence and amount of time served" as a factor to consider in all requests for sentence reductions. Federal Bureau of Prisons, *Program Statement* 5050.50, Jan. 17, 2019, at 12  (last visited Dec. 4, 2020) (Listing nine factors: The nature and circumstances of the defendant's offense, his criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustment, disciplinary infractions, personal history derived from the presentence investigation report, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the severity of the offense.")).

[100] *Andrews*, 2020 WL 4812626, at *7-10.

[101] *See* 18 U.S.C. § 3553(a); *see also Gall v. United States*, 522 U.S. 38, 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (citations and quotations omitted).

Mr. Andrews and Mr. Harris present very different sets of circumstances. Judge Robreno notes, for example, Mr. Andrews would still effectively face a life sentence if sentenced today (unlike Mr. Harris, who would have already been released if sentenced today), because his conviction included thirteen section 924(c) counts. *Andrews*, 2020 WL 4812626, at *2.

[102] *See United States v. Quinn*, 467 F. Supp. 3d 824, 829 (N.D. Cal. June 17, 2020) (stating "[t]he [First Step] Act's broader purpose is . . . consistent with allowing courts to consider such gross sentencing disparities, rather than forcing judges to interpret lack of retroactivity as a complete bar to relief based on subsequent changes to sentencing").

[103] We are mindful this opinion is not shared by all district court judges and this issue is pending in Courts of Appeal, including in our Circuit. *See, e.g.*, *Andrews*, 2020 WL 4812626, *appeal docketed*, No. 20-2768 (3d Cir. Sept. 4, 2020); *United States v. Thacker*, No. 03-20004, 2020 WL 5960685 (C.D. Ill. Oct. 8, 2020), *appeal docketed*, No. 20-2943 (7th Cir. Oct. 8, 2020); *United States v. Rucker*, No. 04-20150, 2020 WL 4365544 (D. Kan. July 30, 2020), *appeal docketed*, No. 20-3164 (10th Cir. Aug. 13, 2020).

[104] 5 U.S.S.G. § 1B1.13 cmt. n.1(D).

[105] U.S. Department of Justice, Federal Bureau of Prisons, *Program Statement 5050.50*, Jan. 17, 2019, at 12 (last visited Dec. 28, 2020), https://www.bop.gov/policy/progstat/5050_050_EN.pdf; *see also Adeyemi*, 470 F. Supp. 3d at 525-29.

[106] *Program Statement 5050.50*, at 1-12.

[107] *Id.* at 12.

[108] *United States v. Saldana*, 807 F. App'x 816, 819 (10th Cir. 2020).

[109] *Program Statement 5050.50*, at 12.

[110] *Id.*

[111] *See, e.g., United States v. Marks*, 455 F. Supp. 3d 17, 32-35 (W.D.N.Y. 2020); *United States v. Defendants*, No. 99-257, 2020 WL 1864906, at *5-6 (C.D. Cal. Apr. 13, 2020); *United States v. Decator*, 452 F. Supp. 3d 320, 323-25 (D. Md. 2020).

[112] *United States v. Redrick*, No. 99-437, 2020 WL 6799253, at *3 (E.D. Pa. Nov. 19, 2020).

[113] Centers for Disease Control, *Obesity, Race/Ethnicity, and COVID-19* (last updated Dec. 16, 2020), https://www.cdc.gov/obesity/data/obesity-and-covid-19.html.

[114] Mr. Harris's increased body mass index – definitively impacting his risk of severe illness from COVID-19 – and the prevalence of COVID-19 in FCI Fort Dix (including in his unit) distinguishes his claim from *United States v. Crandall*, cited in the United States' briefing. No. 89-21, 2020 WL 7080309, at *4-5 (N.D. Iowa Dec. 3, 2020). In denying compassionate release in *Crandall*, Judge Williams noted petitioner – a career offender – suffered from chronic neck pain, chronic arm pain, cervical stenosis, and hip arthritis, which "are simply not relevant to COVID-19." *Id.* He further pointed out petitioner's prison had no active COVID-19 cases among its inmate population. *Id.* at *5.

[115] 470 F. Supp. 3d at 528.

[116] *Andrews*, 2020 WL 4812626 at *13 (finding young age at time of the offenses weighed in favor of granting compassionate release).

[117] *See* United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

[118] *Adeyemi*, 470 F. Supp. 3d at 529.

[119] 18 U.S.C. § 3553(a).

[120] *Pepper v. United States*, 562 U.S. 476, 491 (2011).

[121] 2020 WL 6799253, at *3-4.

[122] No. 95-72, 2020 WL 3058093, at *3 (S.D. Cal. June 8, 2020).

[123] *Id.*

[124] 461 F. Supp. 3d 899, 905-906 (E.D. Mo. 2020).

---

[125] *Id.*

[126] United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (concluding after conducting a study on federal offenders across various age groups that "older offenders are substantially less likely to recidivate following release compared to younger cohorts" and "as age increases recidivism by any measure declined").

[127] *See Pepper*, 562 U.S. at 492.

[128] 463 F. Supp. 3d 585, 602 (W.D. Pa. 2020) (citations and quotations omitted).

[129] *See United States v. Clausen*, No. 00-291-2, 2020 WL 4601247, at *2 (E.D. Pa. Aug. 10, 2020) (finding over twenty years in prison for nine armed robberies to be a "substantial punishment that reflects the seriousness of his offenses and the need for both general and specific deterrence"); *United States v. Redd*, 444 F. Supp. 3d 717, 727-28 (E.D. Va. 2020) (finding the "very substantial punishment" of a twenty-three-year sentence for three armed robberies reflected the seriousness of the offenses and the need for deterrence "by any measure").

Mr. Harris's case is distinguishable from recent decisions denying compassionate release where petitioner did not serve a significant portion of his sentence. *See United States v. Wilson*, No. 19-122-2, 19-123-1, 2020 WL 7640940, at *3 (E.D. Pa. Dec. 23, 2020) (denying compassionate release where petitioner served only nineteen months of his seventy-eight-month sentence); *United States v. Fields*, Nos. 06-155-3, 06-490-2, 2020 WL 7640941, at *3 (E.D. Pa. Dec. 23, 2020) (denying compassionate release where petitioner served "just over half of a 300-month-sentence because granting him release would undermine the need for the sentence to reflect the seriousness of the crimes).

[130] *See United States v. Haynes*, 456 F. Supp. 496, 502 (E.D.N.Y. 2020).

[131] 2020 WL 4674126, at *11; *see also United States v. Quinn*, 467 F. Supp. 3d 824, 831 (N.D. Cal. 2020) (concluding section 3553(a) factors weighed in favor of release of a petitioner with stacked sentences because to find otherwise "would be to sanction the very sort of 'unwarranted sentence disparities' for similar conduct that Congress tasked the courts with avoiding").

[132] *U.S. v. Clausen*, No. 00-291-2, 2020 WL 4260795, at *8 (E.D. Pa. July 24, 2020) (citing *United States v. Rodriguez*, 451 F. Supp. 3d 392, 406 (E.D. Pa. 2020) (quoting U.S.S.G. § 1B1.13(2))).

[133] *Id.* (citing 18 U.S.C. § 3142(g)(1)–(4)).

[134] No. 17-58-1, 2020 WL 5237272, at *5-6 (E.D Pa. Sept. 1, 2020).

[135] *Id.* at *6.

[136] *United States v. Quinn*, 467 F. Supp.3d 824, 831 (N.D. Cal. 2020).

[137] *Id.*